Filed 2/9/17

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| THE PEOPLE, | C069555 |
| Plaintiff and Respondent, | (Super. Ct. No. P08CRF0356) |
| v. | |
| MELISSA NICOLE NICHOLS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of El Dorado County, Kenneth J. Melikian, Judge. Affirmed.

Robert Navarro, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez, Kelly E. LeBel, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant Melissa Nicole Nichols appeals from a victim restitution order following a judgment of conviction. A jury found her guilty of one count of driving under the influence of alcohol causing injury in violation of Vehicle Code section 23153, subdivision (a); count III. She was sentenced to two years in state prison. The trial court awarded full restitution to the parents of the victim for travel expenses and lost wages related to the parents' attendance at court proceedings. On appeal, defendant contends that the trial court erred in declining to apply the doctrine of comparative negligence to reduce the restitution award.

We conclude that the doctrine of comparative negligence does not apply to reduce Penal Code section 1202.4[1] restitution to which the parents of a direct victim are entitled as reimbursement for their own economic loss. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### Charges

Defendant was charged in an information with the murder of James Anthony Payne (§ 187, subd. (a); count I), gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a); count II), driving under the influence of alcohol causing injury to Payne and Kandis Maddox (Veh. Code, § 23153, subd. (a); count III), and driving with a 0.08 percent blood-alcohol level causing injury (Veh. Code, § 23153, subd. (b); count IV). It was also alleged as to counts III and IV that defendant personally inflicted great bodily injury upon Maddox (§ 12022.7, subd. (a)) and that defendant proximately caused death or bodily injury to more than one victim (Veh. Code, § 23558). Count I was dismissed, and the case proceeded to trial on the remaining counts.

---

[1] Undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

2

## Prosecution's Case-in-chief

While defendant was visiting her friends, Kandis Maddox and Matthew Larson, at Maddox's apartment, defendant informed them she had argued with her boyfriend, Anthony Payne, earlier that day. The two had an "off-again/on-again relationship." Defendant told Maddox that Payne was seeing another girl and had bought a motorcycle to impress her. During the several hours that she was at Maddox's apartment, defendant consumed three 24-ounce cans of beer and started a fourth can of beer.

Maddox testified that at around 7:30 p.m. on this August evening, she and defendant decided to go to a bar with another friend, Jessica. Defendant drove her Pontiac Grand Am to pick up Jessica. They brought two or three cans of beer along with them because beer was expensive at the bar and they planned to drink them on the way to Jessica's house.

While driving east on Carson Road, in Camino, they saw Payne on his new motorcycle. They first noticed him when he had "flown" past them going eastbound on Carson Road. Payne got in front of them and then stopped in the vicinity of Jacquier Road and Carson Road. Defendant pulled over, and Maddox rolled down her passenger window to talk to Payne. Maddox told him to leave them alone and "go back to his little girl."[2] Defendant did not say anything to Payne. Payne then took off on Carson Road, heading east.

Joyce Chesser, a motorist, was also traveling eastbound on Carson Road. She saw Payne on the motorcycle, heading west on the same road, make a sharp U-turn ahead of her and drive east. Shortly after the motorcycle changed direction, Chesser saw defendant's car stopped in the middle of Carson Road at the junction of Jacquier Road and the motorcycle was stopped next to the passenger side of the car. Chesser stopped

---

[2] The girl Payne was seeing was 18, Payne was 24, and defendant was 23.

her car some distance behind to wait for defendant and Payne to clear the road. After a few minutes, she saw defendant's car proceed east on Carson Road, and Chesser continued eastbound as well. Chesser lost sight of defendant's car around a curve. Payne stayed put until Chesser got to the curve and then sped around her on the dirt bank to the right side of the road headed east. Chesser also lost sight of Payne's motorcycle around the curve.

About two or three miles up the road, Chesser came around the curve and saw dust, a wheel, and other debris flying in the air. Chesser and the driver in a car behind her pulled off the road. Chesser, who was a nurse, removed her CPR mask and gloves from her car and approached Payne, who was laying "quite a ways up the road" in the east bound lane, but he was no longer alive. Then she approached defendant and Maddox, who were still in defendant's car. She saw Payne's detached leg in the front seat of the car, between defendant and Maddox. Chesser tried to calm defendant and Maddox, who were both injured and screaming, until the paramedics arrived. Chesser testified she did not remember what lane defendant's car was in, but recalled it "maybe was more in the middle."

Defendant and Maddox were transported by helicopter to the hospital. Maddox suffered a shattered eye socket and cheek bone on the right side of her face as well as a wrist injury. She was in the hospital for eight days and underwent two surgeries, during which plates were put into her face and wrist. When interviewed by police, Maddox claimed she could not recall the accident. Defendant also claimed she could not recall the accident when interviewed. Defendant's blood-alcohol level from the samples taken on the night of the collision had an average value of 0.11 percent.

California Highway Patrol (CHP) Officer Ronald Davenport responded to the crash scene. When he arrived, defendant's car was "in the westbound lane, facing an easterly direction, [on the] wrong side of the road." The car was damaged on the front passenger side. In particular, the front right wheel on the passenger side was kicked out

4

and tapered in. Officer Davenport opined that the damage to the right passenger side of the car was unusual because normally, when a car crosses over a double yellow line, it only travels slightly over the line, resulting in "left side to left side damage." There were scrape marks on the pavement that started in the westbound lane and continued to the south end of an orchard, where the right front wheel of the car came to rest. Officer Davenport also observed two gouges in the center of the double yellow lines of the roadway that he opined were caused by the deflation of the right front wheel upon impact. There were no skid marks, and there were no visual obstructions in the roadway.

Officer Davenport testified that he had worked 18 years for the CHP, had advanced accident investigation training, and had investigated thousands of driving under the influence cases. Based on this training and experience, he opined that the collision occurred while Payne was traveling westbound and defendant was traveling eastbound on Carson Road, and defendant turned into Payne's westbound lane, striking Payne head-on. Officer Davenport further opined that Payne was traveling at a high rate of speed, and swerved to the left to avoid defendant's car. As he swerved left, the right side of Payne's motorcycle collided into the right front bumper of defendant's car, ejecting the motorcycle over the car, and ejecting Payne in a southwesterly direction over the car. The motorcycle came down hitting the pavement and continued along the pavement until it finally came to rest 80 feet down the roadway on the south side shoulder of the road.

Sergeant Robert Snook testified that he worked for CHP for over 30 years and, before retiring, led a Multidisciplinary Accident Investigation Team (MAIT), which specialize in accident reconstruction. Sergeant Snook's team was tasked with determining the speeds, position of the vehicles in the roadway, and how the car and motorcycle interacted. His team performed three complete inspections of the car and motorcycle during the seven-month investigation, including one with a crane truck where the motorcycle was inverted and flown over the roof of the car. Based on this

5

investigation, the team determined that "the motorcycle basically flipped over and traveled alongside the roof of the Pontiac," which was confirmed by the "stamping" left on the roof of the car that matched certain parts of the motorcycle. Sergeant Snook opined that at the time of the collision, the front end of defendant's car was completely in Payne's westbound lane. Despite the lack of skid marks on the pavement, the pitching of the motorcycle indicated to Sergeant Snook that Payne applied the front brakes. He opined that defendant was generally traveling at about 37 miles per hour before the crash and slowed to 33 at the time of impact, and Payne was traveling a minimum of 84 miles per hour at the time of impact.

After Sergeant Snook retired, another member of his team, Sergeant Steven Day, took over the lead role in the MAIT investigation into defendant's collision. Sergeant Day was involved in the investigation from the beginning. Sergeant Day testified as an expert in accident reconstruction, and he also opined that defendant was traveling in the eastbound lane and turned into Payne's westbound lane. Sergeant Day also agreed that Payne was in the westbound lane and turned left, toward the double yellow line and eastbound lane, to avoid defendant's car. Sergeant Day testified that the evidence showed Payne was not traveling in the eastbound lane because if he had been in that lane, the debris would have gone in the other direction, north of the roadway. Additionally, physical evidence, including blood and fluid from the motorcycle, was found on top of the car, indicating that Payne went over the car in a straight direction from the westbound lane.

The MAIT investigation concluded that Payne's motorcycle collided into the right front bumper of defendant's car, the bumper collapsed, and the motorcycle's windscreen collided into the very front, right-hand corner of the car. The motorcycle then traveled rearward, until the top portion of the handlebars hit the right front rim of the right front wheel of the car, crushing that rim, and leaving a bolt imprint on it. The front forks, handlebars, and front wheel of the motorcycle exploded, shot off to the side of the car,

6

and deflected down.  The rear portion of the motorcycle pivoted about the front end of the car, along with the rider, standing the motorcycle on its nose at the front tire and inverted itself as it went over the fender, into the windshield, and up over the top of the car upside down.  The motorcycle and rider continued straight off the back of the car because there was not anything on the car to diverge the path of travel.  There was a hole in the windshield caused by Payne's right leg penetrating it.  Plastic cowling and a tool bag from the motorcycle were also in the windshield.  There was stamping in the sheet metal on the roof of the car and the top of the windshield, which the team attributed to the motorcycle's exhaust system.

### Defense Case

David Barbieri, Ph.D., a forensic toxicologist, testified that Payne had methamphetamine and amphetamine in his blood.  He opined that the levels of methamphetamine and amphetamine in Payne's blood were above the typical therapeutic levels.  However, he also testified that methamphetamine stays in a person's system for "three-plus days."

James Tucker, a friend of defendant's family who knew Payne as an acquaintance, testified that he saw Payne on the day of the accident.  He saw Payne at a mutual friend's house around 2:30 or 3:00 a.m. and stayed until around 6:30 a.m.  People at the house were using methamphetamine, although Tucker did not see Payne using any.

Alfred Ferrari, a licensed mechanical engineer and a certified safety professional, testified as an expert on accident reconstruction.  Ferrari testified that he worked as a forensic expert for attorneys and insurance adjusters, and he specialized in vehicle collisions, mechanical failures, walkway accidents, and personal injuries involving machinery or devices.  He opined that Payne's motorcycle was traveling between 84 and 91 miles per hour at the time of impact.  He agreed with the prosecution experts that Payne applied his front brakes.  However, he opined that the point of impact occurred in the eastbound lane rather than the westbound lane.  Ferrari opined Payne was traveling

7

westbound in the eastbound lane, head-on toward defendant at the time of the impact. In reaching this conclusion, Ferrari disputed evidence that the point of impact was denoted by a marking on the pavement left by defendant's right tire and opined the impact was six feet before the scrape in the pavement started. Ferrari further opined the collision was not quite head-on; it was "a little bit angled." Finally, Ferrari opined it was "plausible that [] Payne's high speed was accompanied by other forms of risk-taking," and he could not rule out the possibility that Payne precipitated the accident because he believed the point of impact was within the eastbound lane.

## Prosecution's Rebuttal Evidence

Sergeant Snook disputed Ferrari's opinion that the point of impact occurred in the eastbound lane, six feet away from the gouges in the road. Sergeant Snook opined that the evidence clearly showed that there was very little lateral displacement in the collision, contrary to Ferrari's assertion. He opined that defendant's car was straddling the double yellow line with the front of the car completely in the westbound lane at the point of impact. He opined that Payne was at or near the center of the double yellow line, just barely in the westbound lane, at the point of impact. Had the point of impact occurred in the eastbound lane as opined by Ferrari, then Payne would have traveled diagonally across the windshield, across and then off the driver's side of the car; the evidence showed that Payne went over the passenger side of the hood, continued across the roof, and off the backside of the car in a straight line.

## Verdict and Sentencing

The jury found defendant guilty on count III, driving under the influence of alcohol causing injury to both Payne and Maddox (Veh. Code, § 23153, subd. (a)). The jury was unable to reach a verdict on the remaining counts and special allegations. The trial court declared a mistrial as to those charges and allegations.

Thereafter, the parties agreed that the defense would not challenge the jury's findings and the prosecution would dismiss the remaining charges and enhancements.

8

The parties further agreed that defendant's conviction was not a strike. Pursuant to the agreement, the trial court dismissed the remaining counts and enhancements. The court sentenced defendant to the mid-term of two years imprisonment on count III.

During the sentencing hearing, the trial court stated that it would impose victim restitution in accordance with the probation report recommendation, and ordered defendant to pay victim restitution to Payne's mother, Lisa Patterson, in the amount of $14,635.33.[3] At defendant's request, the court scheduled a hearing.

### Restitution Hearing

Prior to the restitution hearing, the defense argued that the amount of restitution should be reduced under the comparative negligence doctrine pursuant to *People v. Millard* (2009) 175 Cal.App.4th 7 (*Millard*). The trial court identified the issues here as whether the comparative negligence doctrine applied in *Millard* is applicable when a deceased victim's family is seeking restitution rather than the victim, and whether factually, the victim's negligence was a "substantial factor" in causing the economic loss.

Defense counsel argued that for comparative negligence purposes, there was no distinction between a victim and a victim's family. He further argued that civil jury instructions, CACI Nos. 407 [comparative fault of decedent][4] and 430 [causation:

---

[3] The probation report noted, "Even though Mrs. Patterson received money from the defendant's insurance company, her expenses were greater than the amount received. She is requesting restitution in the amount of $14,635.33." However, the probation report did not contain an itemization of Patterson's expenses or indicate how much she received from defendant's insurance company.

[4] CACI No. 407 states: "[*Name of defendant*] claims that [*name of decedent*]'s own negligence contributed to [his/her] death. To succeed on this claim, [*name of defendant*] must prove both of the following: [¶] 1. That [*name of decedent*] was negligent; and [¶] 2. That [*name of decedent*]'s negligence was a substantial factor in causing [his/her] death. [¶] If [*name of defendant*] proves the above, [*name of plaintiff*]'s damages are reduced by your determination of the percentage of [*name of decedent*]'s responsibility. I will calculate the actual reduction."

9

substantial factor],[5] were instructive in determining whether Payne's conduct was a substantial factor in causing the economic loss. Based on Payne's speeding, defense counsel requested the restitution award be reduced by about half. The prosecutor responded that the civil instructions were inapplicable to victim restitution in a criminal case. Additionally, the prosecutor argued that *Millard* was inapplicable to the facts of this case because surviving victims do not step into the place of the direct victim for the purpose of determining victim restitution. She also contended that *Millard* was distinguishable because it "dealt with a surviving victim who was asking for restitution to cover his inability to work for the rest of his life," rather than restitution for the family's costs of attending trial. Finally, she contended that while the *Millard* court held that trial courts have discretion to reduce victim restitution under the comparative negligence doctrine, it did not hold that trial courts are required to perform a comparative negligence analysis.

The trial court ruled that comparative negligence does not apply to restitution ordered to be paid to the deceased victim's family. The court reasoned that if Payne had survived and claimed victim restitution, then *Millard* "would dictate that the doctrine of comparative negligence could be utilized to potentially reduce any restitution." The court observed that based on article I, section 28, subdivision (e), of the California Constitution and section 1202.4, subdivision (k), immediate surviving family of the crime victim are separate victims. The court then noted that *Millard* stands for the proposition that "a victim's comparative negligence can be utilized against him or her in determining restitution." But the court further reasoned that *Millard* does not cover the victims

---

[5] CACI No. 430 states: "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm. [¶] [Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct.]"

10

(victim's parents) in this case: "Our victims were not comparatively negligent. The victims in this case did not contribute to this accident. The victims in this case are not subject to the rule of comparative negligence."

Defense counsel moved for reconsideration of the trial court's ruling. The court reiterated its prior reasoning, adding that its analysis was reinforced by *People v. Giordano* (2007) 42 Cal.4th 644, 657 (*Giordano*), where the California Supreme Court said the family members of a deceased victim in a criminal case, as opposed to a civil case, do not step into the shoes of the deceased victim to recover the deceased's losses. The court was not persuaded by defendant's argument that it should apply the doctrine applicable in civil wrongful death cases, i.e., that any contributory fault of a decedent offsets an award of damages to family members. The trial court reasoned that family members of victims in criminal cases are separate victims entitled to restitution by constitutional amendment and statute. The court denied defendant's motion to reconsider and refused to apply comparative negligence in calculating restitution to the parents.

The court awarded restitution to the victim's parents in the amount of $16,330.72, based on the total economic loss of $24,750.53 and subtracting the $8,419.81 in burial expenses, which was paid for by the Victim's Compensation Board (VCB). The court found that the $16,330.72 in restitution should be offset by the $9,375 the Pattersons received directly from defendant's insurance company,[6] for a remaining total award of $6,955.72.

---

[6] The Pattersons received $9,375 of the $15,000 settlement amount and the balance was paid to the VCB based on a lien for the funeral expenses.

## DISCUSSION

### I. Comparative Negligence in Determining Victim Restitution

### A. The Parties' Contentions

On appeal, defendant contends that the trial court erred in failing to apply the comparative negligence doctrine in determining the amount of victim restitution. Specifically, defendant contends that "[a] court cannot unreasonably dismiss civil law doctrines when applying its discretion to analyzing victim restitution." Defendant further argues, "There is no principled reason why the civil doctrine of comparative fault should be allowed to apply in the criminal restitution context, but only against a surviving victim who was to some degree at fault, but not against his heirs as would be done in a wrongful death case." The People contend that *Millard* was wrongly decided and regardless, it is inapplicable to the facts of this case because the victim's parents did not contribute to Payne's death and because Payne's own conduct was not a substantial factor in causing the collision.

We conclude that *Millard* and the doctrine of comparative negligence have no application where the surviving family members seek section 1202.4 restitution for their own economic loss.[7]

### B. Analysis

Victim restitution is mandatory under the California Constitution. Article I, section 28, subdivision (b), to the California Constitution provides in pertinent part: "(A) It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to seek and secure restitution from the persons convicted of the crimes causing the losses they suffer. [¶] (B) Restitution shall be ordered from the convicted wrongdoer in every case, regardless

---

[7] Accordingly, we need not address the People's argument that *Millard* was wrongly decided or that Payne's conduct was not a substantial factor in causing the collision.

of the sentence or disposition imposed, in which a crime victim suffers a loss." (Cal. Const., art. I, § 28, subd. (b)(13)(A)-(B).) For the purposes of victim restitution under our Constitution, the parents of the direct crime victim are separate victims. (Cal. Const., art. I, § 28, subd. (e); see also § 1202.4, subd. (k)(3)(A).) These constitutional provisions were enacted by the voters as part of Proposition 8, the Victims' Bill of Rights of 1982 (*Giordano, supra*, 42 Cal.4th at p. 652), and they were subsequently amended by the electorate in Proposition 9, Victims' Bill of Rights Act of 2008: Marsy's Law. (Prop. 9, as approved by voters, Gen. Elec. (Nov. 4, 2008) eff. Nov. 5, 2008; Cal. Const., art. I, § 28.) The original constitutional provision in Proposition 8 required the Legislature to enact a statutory scheme implementing the broad mandate in the constitution. (Former Cal. Const., art. I, § 28, subd. (b); *Giordano*, at pp. 652, 655-656.) One such provision is section 1202.4.[8]

---

[8] Other restitution provisions can be found in section 1203.1, subdivisions (b) and (j), which provides that when a defendant is granted probation, a trial court may in its discretion require the defendant to pay restitution as a condition of probation. As our high court noted in *People v. Carbajal* (1995) 10 Cal.4th 1114, 1132, restitution imposed as a condition of probation under section 1203.1 may be imposed when a trial court determines it is "fitting and proper to the end that justice may be done, that amends may be made to society for the breach of the law, for any injury done to any person resulting from that breach, and generally and specifically for the reformation and rehabilitation of the probationer." (§ 1203.1, subd. (j).) In ordering restitution as a condition of probation, "a trial court could properly determine restitution would serve a salutary rehabilitative purpose by directing the defendant to accept the social responsibility." (*Carbajal*, at p. 1125.) Thus, such restitution serves the additional rehabilitative purposes specified in section 1203.1. (*Carbajal*, at p. 1125.) The restitution ordered under section 1203.1 need only be " 'reasonably related to the crime of which the defendant was convicted *or* to future criminality.' " (*Carbajal*, at p. 1123, italics added.) The People suggest *Carbajal*'s reasoning has application here. However, defendant in this case was sentenced to prison and restitution was ordered under section 1202.4. Whether comparative negligence could or should be applied when restitution is ordered as a condition of probation, given that such restitution need only be reasonably related to the goal of deterring future criminality, is not before us.

13

As this court and others have previously noted, " ' " 'A victim's restitution right is to be broadly and liberally construed.' " ' " (*People v. Taylor* (2011) 197 Cal.App.4th 757, 761; *People v. Moore* (2009) 177 Cal.App.4th 1229, 1231 (*Moore*); *People v. Mearns* (2002) 97 Cal.App.4th 493, 500-501.) We review restitution awards for abuse of discretion. (*Giordano, supra*, 42 Cal.4th at p. 663.) "[T]he court's discretion in setting the amount of restitution is broad, and it may use any rational method of fixing the amount of restitution as long as it is reasonably calculated to make the victim whole." (*People v. Baker* (2005) 126 Cal.App.4th 463, 470.)

Victims are entitled to an amount of restitution so as to make them whole but not more than their actual losses arising out of the defendant's criminal conduct. (*People v. Fortune* (2005) 129 Cal.App.4th 790, 795-796.) One object of restitution under section 1202.4 is to " 'restore the economic status quo' " by returning to the victim " 'funds in which he or she has an ownership interest' " following a criminal conviction. (*Giordano, supra*, 42 Cal.4th at p. 658.) However, "a restitution order 'is not . . . intended to provide the victim with a windfall.' " (*Millard, supra*, 175 Cal.App.4th at p. 28.)

As she did in the trial court, on appeal, defendant relies primarily on *Millard, supra*, 175 Cal.App.4th 7, to support her contention that the comparative negligence doctrine should be applied here to reduce the restitution owed to the victim's parents. At issue in *Millard* was the amount of restitution owed to the injured victim of defendant's driving under the influence with injury conviction. The victim there survived and sought restitution for his medical expenses and future lost earnings. (*Id.* at pp. 20-24.) The trial court in *Millard* reduced the victim's restitution by 25 percent because of the victim's comparative negligence. (*Id.* at p. 36.) The *Millard* court held that the trial court did not abuse its discretion by reducing the restitution award, because "a trial court is not precluded from applying the doctrine of comparative negligence to reduce the amount of Penal Code section 1202.4 victim restitution that a criminally negligent defendant must

14

pay when the victim's negligence was also a substantial factor in causing his or her economic losses." (*Millard*, at p. 41.)

The *Millard* court reasoned that criminal defendants are required to reimburse their victims only for those economic losses suffered " 'as the result of the criminal defendant's conduct,' " and "[i]f the doctrine of comparative negligence were not applicable, a criminally negligent defendant could be required to reimburse a victim for economic losses that were comparatively the result or the fault of the *victim's own negligence*." (*Millard, supra*, 175 Cal.App.4th at p. 39, italics added; see also § 1202.4, subd. (f)(3).) The court further reasoned, "Application of comparative negligence holds a criminally negligent defendant responsible for the full amount of the victim's economic losses that resulted from the defendant's proportionate fault. In such circumstances, we do not believe the application of comparative negligence is contrary to either the express provisions or the purposes of Proposition 8 and Penal Code section 1202.4. The victim will still receive full reimbursement for economic losses attributable to the criminally negligent defendant's offense (i.e., in proportion to the defendant's fault in causing the victim's losses)." (*Millard*, at p. 41.) The court concluded, "absent any express constitutional or statutory provision or judicial authority to the contrary, we believe our interpretation of Penal Code section 1202.4, subdivision (f)(3), results in a more logical and consistent approach toward victim restitution that, in effect, parallels a victim's usual tort civil remedy for economic losses caused by the defendant's criminal conduct. Although a Penal Code section 1202.4 victim restitution order is obtained by means of an expedited criminal hearing prosecuted by the People, *there do not appear to be any compelling policy or other reasons* to preclude the application of the doctrine of comparative negligence by a trial court in ordering a criminally negligent defendant to pay *restitution to a victim whose economic losses were also caused in part by the victim's contributory negligence*." (*Millard*, at p. 39, italics added.)

15

The instant case is distinguishable from *Millard*. Here, the people seeking restitution are the direct crime victim's parents. Under the California Constitution and section 1202.4, they are separate victims and they sought restitution for their own personal economic loss, not that of their son.[9] In *Giordano, supra*, 42 Cal.4th 644, our high court held that victims under section 1202.4 may recover restitution only for losses suffered personally, and may not "step into the shoes" of another victim to recover that victim's losses. (*Giordano*, at p. 657 [the victim's wife, however, was entitled to recover her personal loss of future economic support resulting from the victim's death].) In our view, the parents here do not step into the shoes of the victim for purposes of comparative negligence where they seek restitution for their own personal losses. They were not negligent, they had nothing to do with their son's death, and they merely sought restitution for personal economic losses related to attending the criminal proceedings. The *Millard* court focused on losses "that were comparatively the result or the fault of the *victim's own negligence*" (*Millard, supra*, 175 Cal.App.4th at p. 39, italics added) and allowed application of comparative negligence principles in ordering a criminally negligent defendant "to pay restitution to *a victim whose economic losses were also caused in part by the victim's contributory negligence*." (*Ibid*., italics added.) *Millard* does not apply in the context of the instant case, where separate victims themselves were not negligent and did not partially contribute to their own loss.

Despite whatever fault the deceased victim may have had here, defendant nevertheless committed a crime and was convicted of that crime. The prosecution of that

[9] Our case is also different from the situation in *People v. Runyan* (2012) 54 Cal.4th 849, 858-859, where our high court held—based partially on Marsy's Law—that when a crime victim has died, restitution owed to that person for economic loss personally incurred by the victim as a result of the commission of the crime is properly payable to the decedent's estate. Here, the parents do not seek restitution on behalf of their son's estate, but rather they seek it for their own personal economic loss.

16

crime resulted in criminal proceedings attended by the victim's parents. But for the commission of that crime, there would not have been court proceedings and the victim's parents would not have personally incurred any economic losses. (See *People v. Crisler* (2008) 165 Cal.App.4th 1503, 1509 (*Crisler*) [victim's mother, father, and stepfather were entitled to expenses and wages lost as a result of attending court proceedings in the defendant's prosecution; these expenses would not have been incurred had the defendant not killed their son].) The parents' attendance at the court proceedings and the costs associated with that attendance were a direct result of defendant's criminal conduct. (See *Moore, supra*, 177 Cal.App.4th at p. 1233 [the trial court did not abuse its discretion in ordering the defendant to pay a non-testifying burglary victim for the wages he lost while attending court proceedings; such losses were a "direct result" of the defendant's conduct].) There was no negligence by the parents here that could be said to have "caused in part" their losses. (See *Millard, supra*, 175 Cal.App.4th at p. 39.) Thus, the parents, standing in their own shoes as separate victims, were entitled to restitution for the cost of attending court proceedings and lost wages.

As we have noted, the *Millard* court concluded there were no "*compelling policy or other reasons* to preclude the application of the doctrine of comparative negligence" in that case. (*Millard, supra*, 175 Cal.App.4th at p. 39.) The same cannot be said here. Here, the parents incurred expenses at no fault of their own. In our view, we give full effect to the constitutional provisions twice enacted by the voters and the statutory provisions enacted by the Legislature classifying certain family members of a crime victim as separate victims for restitution purposes by distinguishing the situation where a negligent surviving victim seeks restitution for his losses from the situation presented here, where separate non-negligent victims claim restitution for their own economic loss. (Cal. Const., art. I, § 28, subd. (e); § 1202.4, subd. (k)(3)(A).)

Defendant relies on discussion from this court's opinion in *People v. Dehle* (2008) 166 Cal.App.4th 1380 (*Dehle*) in further support of her contention that the comparative

17

negligence doctrine should apply here. But defendant only partially quotes from *Dehle*, a case that did not directly address the issue of comparative negligence.

In *Dehle*, the trial court granted restitution to the wife of the victim in a vehicular manslaughter case to compensate her for lost future earnings and household services. (*Dehle, supra*, 166 Cal.App.4th at pp. 1385-1386.) But the restitution hearing was flawed because the prosecution did not attend, and this court remanded for a new restitution hearing. (*Id*. at pp. 1386, 1391.) In doing so, the court reasoned that because the prosecution was not present to advocate on behalf of the People (not just the victim), the People "at large" were not heard on several issues. The court stated, "*While we express no opinion on the resolution of these issues*, they include, among others, the following: given the fact that it appears that the decedent was not wearing a seatbelt at the time of the accident, whether the decedent's own negligence contributed to his death and whether defendant should be required to make restitution for economic harm caused in part by the victim himself."[10] (*Id*. at pp. 1388-1389, italics added.) Defendant argues *Dehle* is important because it suggests comparative fault should be a consideration even in a case where a separate victim (the wife of the victim) sought restitution. Yet, it is clear from the italicized text (which was omitted from defendant's briefing) that this court took no position on the application of comparative negligence or the other legal and factual issues it listed. (See fn. 11, *ante*.) Moreover, this court was careful to recognize

---

[10] The other issues identified by the *Dehle* court were: "whether it was just to deny [the wife] restitution for her attorney fees in the underlying action against the insurance carrier because her attorney refused to produce his billing records; whether the proper measure of [the wife]'s economic loss was the loss of [the victim]'s gross income to age 67, adjusted as it was by [the wife]'s expert witness, or something less than that, such as [the victim]'s taxable income; whether it was appropriate to reduce [the victim]'s gross income by 30 percent per year based on an estimate of his personal consumption; and whether the victim restitution statutes allow for or require compensation for the loss of a decedent's services around the home and, if so, the proper measure of that compensation." (*Dehle, supra*, 166 Cal.App.4th at p. 1389.)

18

that "the focus of a restitution hearing in a criminal matter—economic compensation to the victim, rehabilitation of the offender, and the deterrence of the offender and others from similar conduct—is different from the focus of a civil wrongful death action even though the former raises many of the same issues as the latter." (*Id*. at p. 1389.) In the context of the situation before us, where we give the constitutional and statutory provisions broad and liberal construction to ensure the separate victims are fully reimbursed (see *Moore, supra*, 177 Cal.App.4th at p. 1231), we conclude the trial court did not abuse its discretion in ordering defendant to pay the parents for their economic losses associated with attending the criminal proceedings.

While the issue before us is not addressed directly in any published decision, a review of civil case law on comparative negligence is consistent with our view. In civil cases, even where a defendant's negligence is offset by the comparative negligence of a plaintiff, if there are multiple plaintiffs, the recovery of other, non-negligent plaintiffs is not reduced for imputed or comparative negligence. For example, in *Wilkins v. Sawyer* (1965) 232 Cal.App.2d 458, 462 (*Wilkins*), the court held that where both drivers in a two-car collision were negligent, but the passenger in one car was "clearly innocent of wrong," the driver's comparative negligence would not bar the passenger's right to recover for her personal injuries.

Similarly, before the voter's 1986 enactment of Civil Code section 1431.2 in Proposition 51, damages for loss of consortium were not reduced because of the negligence of the deceased spouse. (*Lantis v. Condon* (1979) 95 Cal.App.3d 152, 157-159 (*Lantis*).) In *Lantis*, the court reasoned that reducing a widow's damages for loss of consortium by the amount of contributory negligence attributable to her husband would "force a plaintiff, who was herself free from fault, to pay a penalty for the negligence of another." (*Id.* at p. 159.) Additionally, the *Lantis* court observed, "If the injury [the wife] suffered were a broken leg while riding in a vehicle driven by her contributorily negligent husband, there would be no question but that his contributory negligence would not

19

destroy or mitigate her right to full recovery. [Citation.] There is no reason why injury to her psychological and emotional state should be treated any differently than injury to her physical well being." (*Id.* at p. 157, citing *Wilkins*, *supra*, 232 Cal.App.2d at p. 462.) We find the reasoning in *Lantis* persuasive here.[11] Separate crime victims like the parents in this case are analogous to the plaintiffs in *Wilkins* and *Lantis*.

Defendant also cites civil law principles. She argues that since a surviving heir's damages can be reduced by the application of the comparative negligence doctrine in a wrongful death case, so too should the parents' restitution award be reduced here. Defendant relies on *Craddock, supra*, 89 Cal.App.4th 1300, as an example. In that wrongful death case, comparative negligence was applied to reduce loss of consortium damages to the spouse. (*Id.* at pp. 1309-1311.) But *Craddock* is based on Civil Code section 1431.2, which was enacted in Proposition 51. (*Craddock*, at pp. 1309-1311.) That provision can apply to loss of consortium and states that "[e]ach defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault." (See fn. 11, *ante*.) That statute, which had the effect of abrogating joint and several liability for non-economic damages,

---

[11] Subsequent to *Lantis*, the voters enacted Proposition 51 and Civil Code section 1431.2 (*Craddock v. Kmart Corp.* (2001) 89 Cal.App.4th 1300, 1309-1310 (*Craddock*). Civil Code section 1431.2 provides in pertinent part: "(a) In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint. *Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault*, and a separate judgment shall be rendered against that defendant for that amount. [¶] (b) [¶] . . . [¶] (2) For the purposes of this section, the term 'non-economic damages' means subjective, non-monetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, *loss of consortium*, injury to reputation and humiliation." (Italics added.) This enactment effectively abrogated the holding in *Lantis*. (See *Craddock*, at p. 1311 [holding that the trial court correctly reduced a spouse's loss of consortium award "under the compulsion" of Civil Code, § 1431.2].)

has no application to restitution in a criminal case. Indeed, when there are multiple defendants in a criminal case, the trial court has the authority to make the obligation joint and several. (*People v. Neely* (2009) 176 Cal.App.4th 787, 800; *People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1535.) Consequently, we find defendant's reliance on *Craddock* unpersuasive and, notwithstanding the abrogation of the holding in *Lantis* by Proposition 51 (see fn. 11, *ante*), we nevertheless find the *Lantis* court's reasoning a closer analogue to the policy goals of victim restitution in criminal cases.

Defendant also relies on *Horwich v Superior Court* (1999) 21 Cal.4th 272, another wrongful death case, for its observation that "some defenses can be asserted equally against the decedent or the heirs, principally comparative negligence."[12] (*Id.* at p. 284.) The *Horwich* court explained that in wrongful death cases, "principles of comparative fault and equitable indemnification support an apportionment of liability among those responsible for the loss, including the decedent." (*Id.* at p. 285.) But the court also noted that wrongful death is the product of a statute, Code of Civil Procedure section 377.60, which provides standing to assert a " '*cause of action* in favor of the heirs as beneficiaries [of a decedent], based upon their own independent pecuniary injury suffered by loss of a relative, and distinct from any the deceased might have maintained had he survived.' "[13]

---

[12] Defendant also cites *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 770, a wrongful death case where a spouse's recovery following her husband's death in a collision was limited where the jury found the decedent to be 90 percent at fault. However, that case does not discuss the doctrine of comparative negligence or its application to third parties in any detail.

[13] In pertinent part, Code of Civil Procedure section 377.60 provides as follows: "A cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by any of the following persons or by the decedent's personal representative on their behalf: [¶] (a) The decedent's surviving spouse, domestic partner, children, and issue of deceased children, or, if there is no surviving issue of the decedent, the persons, including the surviving spouse or domestic partner, who would be entitled to the property of the decedent by intestate succession. [¶] (b) Whether or not qualified

21

(*Horwich*, at p. 283.) "The right to sue for wrongful death damages is a creature of statute, and exists only so far and in favor of such persons as the Legislature has provided." (*Kim v. Yi* (2006) 139 Cal.App.4th 543, 546.) Code of Civil Procedure section 377.61 provides that in an action for wrongful death, "damages may be awarded that, under all the circumstances of the case, may be just." These statutes have no bearing in a criminal restitution matter, which is the product of distinct public policy considerations embodied in our state's Constitution, and there are no constitutional provisions or criminal statutes that provide an analogue to these two civil procedure statutes. Moreover, as one of the cases cited in *Horwich* stated, in "wrongful death actions, the fault of the decedent is attributable to the surviving heirs whose recovery must be offset by the same percentage. [Citation.] In contrast, a spouse's damages for loss of consortium are not proportionately reduced by the amount of comparative negligence attributable to the other spouse." (*Atkins v. Strayhorn* (1990) 223 Cal.App.3d 1380, 1395, citing *Lantis, supra*, 95 Cal.App.3d at p. 159.) For the reasons we have stated, the cases involving non-negligent plaintiffs and pre-Proposition 51 loss of consortium provide a better analogue to our case, where the parents of crime victims seek restitution for their own economic losses.

Under the original version of article I, section 28, subdivision (b), enacted in Proposition 8, and the current section 1202.4, subdivisions (f) and (g), trial courts need

---

under subdivision (a), if they were dependent on the decedent, the putative spouse, children of the putative spouse, stepchildren, or parents. As used in this subdivision, 'putative spouse' means the surviving spouse of a void or voidable marriage who is found by the court to have believed in good faith that the marriage to the decedent was valid. [¶] (c) A minor, whether or not qualified under subdivision (a) or (b), if, at the time of the decedent's death, the minor resided for the previous 180 days in the decedent's household and was dependent on the decedent for one-half or more of the minor's support."

not award full restitution when there are "compelling and extraordinary reasons."**14**  No such reasons appear in the record before us.  To the contrary, there are compelling reasons supporting the trial court's exercise of discretion.  As this court noted in *Crisler*, it is entirely reasonable that a deceased victim's parents would attend criminal proceedings " ' "to gain some measure of closure and a sense that justice has been done." ' " (*Crisler, supra*, 165 Cal.App.4th at p. 1509.)  In our view, it is defendant's responsibility to *fully* compensate these victims for the cost of doing so under the constitutional provisions enacted by the voters and the statutory provisions enacted by the Legislature.

We conclude that the trial court appropriately exercised its discretion in declining to apply comparative negligence to the parents' restitution claim.

---

**14**  Although the *Millard* court expressly disclaimed reliance on this exception (*Millard, supra*, 175 Cal.App.4th at p. 42, fn. 16), we nevertheless observe that, at least under the statute, trial courts may have discretion to award less than full restitution.  (*Giordono, supra*, 42 Cal.4th at p. 661.)  However, as the People have noted, the amendments made in Marsy's Law deleted the "compelling and extraordinary" exception, and the Official Voter Information Guide explained, "[T]his measure requires that, without exception, restitution is to be ordered from offenders who have been convicted in every case in which a victim suffers a loss."  (Official Voter Information Guide for November 4, 2008, General Election, p. 58 at <http://vigarchive.sos.ca.gov/2008/general/analysis/prop9-analysis.htm> [as of Feb. 9, 2017].)  Whether the statutory exception is still viable after Marsy's Law remains to be determined, but whether it remains viable makes no difference here.  If Marsy's Law has served to abrogate the statutory exception, our holding is consistent with the intent of the voters who enacted Marsy's Law in that it provides *full* restitution to the parents of the deceased victim.  If the statutory exception is still viable, as we explain, there are no compelling and extraordinary reasons that would warrant depriving the parents of the full amount of restitution to which they are entitled.

## DISPOSITION

The judgment is affirmed.


                                            MURRAY          , J.


We concur:


      BUTZ           , Acting P. J.


      DUARTE         , J.