Filed 3/12/21  P. v. Wolfe CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B305833 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA425130) |
| v. | |
| ERIC JONATHAN WOLFE, | |
| Defendant; | |
| BRAD WOLFE, as Special Administrator, etc., | |
| Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  William C. Ryan, Judge.  Affirmed.

Michael Evan Beckman for Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Michael R. Johnsen and Paul M. Roadarmel, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

The special administrator of the Estate of Eric Jonathan Wolfe, as successor in interest to defendant Eric Jonathan Wolfe,[1] appeals portions of the superior court's March 9, 2020 restitution order.

From 2007 to 2013, appellant and his codefendants engaged in a predatory real estate and mortgage fraud scheme through which they acquired properties from homeowners in financial distress by falsely promising to assist the homeowners with short sales or loan modifications. As part of a fake loan modification or short sale process, appellant would forge or have the homeowners sign grant deeds conveying the properties to one of appellant's many companies operating under various names. Unbeknownst to the homeowners, appellant would later alter the deeds to indicate the properties had been conveyed as gifts.

After appellant wrongfully acquired the properties from the homeowners, payments on the mortgages for those properties would cease, and appellant would rent out or sell the properties, pocketing the proceeds. In some instances, appellant paid the lending institutions less than the amounts outstanding on the mortgages based on fraudulent below-market valuations and then sold the properties at a profit. On other occasions, when the lending institutions attempted to foreclose on the properties, appellant would seek to prevent or delay foreclosure in order to

_____

[1] Wolfe died on February 11, 2018, while serving his 16-year 8-month prison sentence. His brother was appointed special administrator to the estate in Los Angeles County Superior Court probate case No. 18STPB06847 and given the power to retain an attorney and act on behalf of the estate at the restitution hearing. We refer to Wolfe and the special administrator interchangeably herein as appellant.

extract more rents by submitting fictitious offers and/or by filing fraudulent lawsuits and lis pendens on the properties.

On June 25, 2014, the Los Angeles County Grand Jury returned a 118-count indictment against appellant and 10 codefendants,[2] charging them in connection with the scheme under Penal Code[3] sections 182, subdivision (a), 487, subdivision (a), 115, subdivision (a), and 532f, as well as failing to file and filing false state tax returns.

On June 26, 2015, appellant pleaded guilty to 22 of the 118 counts in the indictment. Specifically, appellant pleaded guilty to one count of conspiracy to commit grand theft of personal property as charged in count 1 (Pen. Code, §§ 182, subd. (a), 487, subd. (a)), ten counts of grand theft of personal property (Pen. Code, § 487, subd. (a); counts 3, 16, 33, 40, 44, 53, 54, 65, 96, and 105), four counts of procuring or offering a false instrument (Pen. Code, § 115, subd. (a); counts 12, 28, 75, and 83), one count of forgery (Pen. Code, § 475, subd. (a); count 15), two counts of mortgage fraud (Pen. Code, § 532f, subd. (a)(1); counts 50 and 88), one count of filing a false tax return (Rev. & Tax. Code, § 19705, subd. (a); count 110), and three counts of failing to file a tax return (Rev. & Tax. Code, § 19706; counts 111, 112, and 113). Appellant also admitted an aggravated white collar special allegation under Penal Code section 186.11, subdivision (a)(2) as to counts 1, 3, 13, 16, 33, 40, 44, 53, 54, 65, 96, and 105, as well as the special allegation that the loss exceeded $200,000 (Pen. Code, former § 12022.6, subd. (a)(2)), based on the total amount of the theft. The remaining counts of the indictment were dismissed.

---

[2] The codefendants are not parties to this appeal.

[3] Undesignated statutory references are to the Penal Code.

Appellant was sentenced to 16 years 8 months in state prison. A restitution hearing was deferred until after the case was resolved against all defendants.[4]

The restitution hearing took place over five days in June, September, and December 2019. The prosecution presented 121 exhibits in support of its restitution claims, including two exhibits (People's exhibits 97 & 98) setting forth the losses and calculations of those losses as to each property, and called Special Agent Thomas Donohue and Investigative Auditor Hengru Connie Chen to testify. Several individuals gave victim impact statements. No witnesses testified on behalf of the special administrator.

The trial court issued a detailed memorandum of decision on March 9, 2020, awarding restitution to several lending institutions, two estates, and various individuals, as well as

---

[4] Prior to any restitution hearing, appellant filed notice of appeal without obtaining a certificate of probable cause. We ordered the appeal limited to issues that would not require a certificate of probable cause. (*People v. Wolfe* (Oct. 2, 2017, B285315).) Appellant died while the appeal was pending, and on May 4, 2018, we granted the People's motion to dismiss and partially abate the proceedings, but ordered that the criminal conviction "remain[ ] in force and effect to the extent necessary for the trial court to enter and enforce orders with respect to restitution and the receivership. Restitution orders and the receivership are not abated." (See <https://appellatecases .courtinfo.ca.gov/search/case/dockets.cfm?dist=2&doc_id=2229616 &doc_no=B285315&request_token=NiIwLSEmTkw9WzBBSCI9V ElIUDg6USxTKyNOSztSICAgCg%3D%3D> [as of Mar. 1, 2021], archived at <https://perma.cc/A8LQ-T9M6>.)

4

interest on the stipulated amount owed to the Franchise Tax Board.  Asserting many of the same arguments raised below, appellant challenges the restitution awarded to the Estates of Jean Ablott ($208,777.03) and Lyle Gilmor Skarsten ($231,636.91) (the Estates), the lending institutions—Fannie Mae ($48,248.45 and $44,584.16), Bank of America ($54,250, $66,300, $34,535, $67,496, and $99,472.50), GMAC Mortgage ($16,250 and $43,750), JP Morgan Chase ($54,250), IndyMac/One West Bank[5] ($36,050), and Wells Fargo Bank ($62,546.42) (collectively the Lending Institutions)—and Guillermo Cilia ($112,117).  Appellant also contests the award of interest to the Franchise Tax Board.

## DISCUSSION

I.  **The Superior Court Properly Exercised Its Discretion in Awarding Restitution to the Estates, the Lending Institutions, and Guillermo Cilia**

A. *Relevant legal principles*

Passed by the voters in 1982, Proposition 8 "established the right of crime victims to receive restitution directly 'from the persons convicted of the crimes for losses they suffer.'  (Cal. Const., art. I, § 28, subd. (b).)  The initiative added article I, section 28, subdivision (b) to the California Constitution:  'It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity

---

[5] After IndyMac failed in 2008, the bulk of its assets were acquired by One West Bank.  In its memorandum of decision, the superior court referred to the lender as "IndyMac/One West Bank," a designation we adopt.

5

shall have the right to restitution from the persons convicted of the crimes for losses they suffer. [¶] Restitution shall be ordered from the convicted persons in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss, unless compelling and extraordinary reasons exist to the contrary.' " (*People v. Giordano* (2007) 42 Cal.4th 644, 652 (*Giordano*).)

Section 1202.4 represents the Legislature's implementation of Proposition 8's broad constitutional mandate. (*People v. Stanley* (2012) 54 Cal.4th 734, 736 (*Stanley*).) The statute begins with a declaration of the Legislature's intent "that a victim of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant convicted of that crime." (§ 1202.4, subd. (a)(1); *Giordano*, *supra*, 42 Cal.4th at p. 656.) Section 1202.4, subdivision (f) provides that "in every case in which a victim has suffered economic loss *as a result of* the defendant's conduct, the court *shall* require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." (Italics added; *Stanley*, at p. 737.) The statute further requires that the restitution award "shall be of a dollar amount that is sufficient to *fully* reimburse the victim or victims for *every* determined economic loss incurred as the result of the defendant's criminal conduct." (§ 1202.4, subd. (f)(3), italics added; *Stanley*, at p. 737; *Giordano*, at p. 656.) Finally, "the trial court 'shall order *full restitution* unless it finds compelling and extraordinary reasons' not to do so." (*Stanley*, at p. 737, italics added, quoting former § 1202.4, subd. (f); see also *Giordano*, at p. 656, quoting former § 1202.4, subd. (g).)

6

Section 1202.4's mandate that the restitution order reimburse the victim to the extent that the victim's economic loss occurs "as a result of" the defendant's criminal conduct requires a showing of direct causation. (§ 1202.4, subds. (a) & (f); *In re S.E.* (2020) 46 Cal.App.5th 795, 803; *People v. Jones* (2010) 187 Cal.App.4th 418, 425.) California courts have adopted the "substantial factor" test in analyzing whether a victim's economic loss results from the defendant's criminal conduct for purposes of mandatory victim restitution. (*People v. Lockwood* (2013) 214 Cal.App.4th 91, 102; *People v. Holmberg* (2011) 195 Cal.App.4th 1310.) That standard is relatively broad, requiring only that the defendant's criminal conduct be more than a negligible or theoretical cause of the injury to the victim. (*Holmberg*, at p. 1321.) " 'Thus, "a force which plays only an 'infinitesimal' or 'theoretical' part in bringing about injury, damage, or loss is not a substantial factor" [citation], but a very minor force that does cause harm is a substantial factor.' " (*Id.* at p. 1322, quoting *Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th 71, 79.)

A "victim" is any individual or entity who has suffered economic loss as a result of the commission of a crime of which the defendant was convicted, including a "corporation, business trust, estate, trust, partnership, association, joint venture, government, governmental subdivision, agency, or instrumentality, or any other legal or commercial entity when that entity is a direct victim of a crime." (§ 1202.4, subds. (k)(2), (a)(1), (f)(3); *People v. Martinez* (2005) 36 Cal.4th 384, 393; *People v. Crow* (1993) 6 Cal.4th 952, 957 [a " 'victim' " is a " 'person who is the object of a crime,' " and may include an entity that is not a natural person].) Further, "[w]hen the actual victim of a crime has died, the estate, acting in the decedent's stead, steps into the

7

decedent's shoes to collect restitution owed *to the decedent*, but which the decedent cannot personally receive because of his or her death. Thus, a decedent's estate—or, more precisely, its executor or administrator as the decedent's personal representative—is a proper recipient, on the decedent's behalf, of restitution owed *to the decedent*, as an actual and immediate crime victim, for economic losses the decedent incurred as a result of the defendant's offenses against the decedent." (*People v. Runyan* (2012) 54 Cal.4th 849, 857 [nothing in the language of § 1202.4, subd. (f) suggests a defendant is absolved of responsibility to pay restitution for the economic loss a victim personally incurred as a result of the crime if the victim has died].)

Section 1202.4 requires that a defendant make restitution to all victims who have suffered economic loss as a result of the defendant's criminal conduct, regardless of whether the victims were named in the charging document. (*People v. Walker* (2014) 231 Cal.App.4th 1270, 1276 (*Walker*) [§ 1202.4 imposes no obligation to name victims, "and judicially imposing such a duty would make a victim's entitlement to restitution turn on the happenstance of whether the prosecutor located or named that victim before the defendant pled or was convicted"].)

In addition, even absent a victim's claim for restitution, the prosecution has authority to seek restitution on the victim's behalf. (*People v. Selivanov* (2016) 5 Cal.App.5th 726, 784 (*Selivanov*) [§ 1202.4 is "devoid of any language limiting the class of compensable victims to those who affirmatively request restitution"].) Article I, section 28, subdivision (b)(13)(A) of the California Constitution states unequivocally that every victim who suffers a loss arising from the crime of which the defendant

8

was convicted is entitled to restitution from the defendant. " 'The *only* qualification is that the loss must be 'the result of [the defendant's] criminal activity.' " (*Selivanov*, at p. 784, italics added.) As the court in *Selivanov* explained, section 1202.4, subdivision (f) "uses disjunctive language to indicate that the amount of restitution may be based either on the 'amount of loss claimed by the victim or victims' *or* 'any other showing to the court,' suggesting that a claim by the victim is not . . . a 'primary predicate condition' for the issuance of a restitution order." (*Id.* at p. 785.) "Instead, 'someone,' such as the People, may initiate the restitution process on behalf of a victim."[6] (*Ibid.*)

---

[6] Moreover, particularly where the defendant has entered into a plea agreement, the state has its own interest in securing restitution on behalf of any victims of the defendant's criminality. (*People v. Runyan, supra*, 54 Cal.4th at p. 865 ["the requirement that a convicted criminal defendant pay restitution for the losses caused by his crime has aims beyond strict compensation that include deterrence and rehabilitation"].) For example, as one court has explained, "While a settlement agreement with, and release of, a defendant's insurance company may reflect a victim's willingness to accept the amount paid in full satisfaction for all civil liability, it does not reflect the willingness of the People to accept that sum in satisfaction of the defendant's rehabilitative and deterrent debt to society. A restitution order pursuant to a defendant's plea is an agreement between the defendant and the state. [Citation.] The victim is not party to the agreement, and a release by the victim cannot act to release a defendant from his financial debt to the state any more than it could terminate his prison sentence." (*People v. Bernal* (2002) 101 Cal.App.4th 155, 162 (*Bernal*).)

A restitution hearing is not a civil trial, but a criminal sentencing hearing which lacks the formality of a trial. (*People v. Smith* (2011) 198 Cal.App.4th 415, 434.) " '[A] hearing to establish the amount of restitution does not require the formalities of other phases of a criminal prosecution.' " (*People v. Keichler* (2005) 129 Cal.App.4th 1039, 1048 (*Keichler*); *People v. Kelly* (2020) 59 Cal.App.5th 1172, 1181 (*Kelly*).) The defendant is not entitled to a jury, and " '[i]n determining the propriety and amount of restitution, the preponderance of the evidence standard satisfies due process.' " (*Smith*, at p. 433.) Indeed, "[s]ection 1202.4 does not, by its terms, require any particular kind of proof." (*People v. Gemelli* (2008) 161 Cal.App.4th 1539, 1542–1543 (*Gemelli*).)

" ' " '[S]entencing judges are given virtually unlimited discretion as to the kind of information they can consider' " ' in determining victim restitution." (*People v. Phu* (2009) 179 Cal.App.4th 280, 283 (*Phu*).) "[T]he standard of evidence at a restitution hearing does not necessarily require a crime victim to produce detailed billing records, receipts, or business invoices." (*Kelly*, *supra*, 59 Cal.App.5th at p. 1183; *Gemelli, supra*, 161 Cal.App.4th at p. 1542.) Further, a trial court may rely on hearsay documents in determining victim restitution. (§ 1203.1d, subd. (d) ["Documentary evidence, such as bills, receipts, repair estimates, insurance payment statements, payroll stubs, business records, and similar documents relevant to the value of the stolen or damaged property, medical expenses, and wages and profits lost shall not be excluded as hearsay evidence"].)

The statutory provisions implementing a victim's constitutional right to restitution are to be broadly and liberally construed. (*Stanley*, *supra*, 54 Cal.4th at p. 737; *People v. Nichols*

10

(2017) 8 Cal.App.5th 330, 342 (*Nichols*).)  We review a challenge to the amount of victim restitution for abuse of discretion, and will not reverse the award unless it is arbitrary or capricious. (*Kelly*, *supra*, 59 Cal.App.5th at p. 1181; *In re S.E.*, *supra*, 46 Cal.App.5th at p. 803.)  The trial court " 'may use any rational method of fixing the amount of restitution as long as it is reasonably calculated to make the victim whole' " (*Nichols*, at p. 342), and when a factual and rational basis exists for the restitution order, no abuse of discretion will be found by the reviewing court (*Giordano*, *supra*, 42 Cal.4th at pp. 663–664 [under this standard, the trial court is required only to "employ a method that is rationally designed to determine the . . . victim's economic loss"]).

Finally, "the People carry the initial burden of demonstrating the amount of the victim's economic loss. [Citations.]  Their showing establishes the amount of restitution the victim is entitled to receive, and the burden shifts to the defendant to prove by a preponderance of the evidence that the loss is other than that claimed." (*Selivanov*, *supra*, 5 Cal.App.5th at p. 788; *People v. Taylor* (2011) 197 Cal.App.4th 757, 761 (*Taylor*) ["Once the victim makes a prima facie showing of economic losses incurred as a result of the defendant's criminal acts, the burden shifts to the defendant to disprove the amount of losses claimed"].)  Accordingly, absent a challenge by the defendant, an award in the amount specified in the restitution claim is not an abuse of discretion.  (See *Keichler*, *supra*, 129 Cal.App.4th at p. 1048.)

B. ***The superior court properly awarded restitution to the Estates based on the economic losses they sustained as a direct result of appellant's criminal offenses, including the conspiracy to commit theft, to which appellant pleaded guilty***

    **1. The challenged restitution awards to the Estates**

        *a. The restitution award of $208,777.03 to the Estate of Jean Ablott based on counts 1 (conspiracy to commit grand theft of personal property) and 83 (procuring and offering a false or forged instrument) with respect to the property located at 111 East Palmdale Avenue in Orange*

In 2003 before her death on November 16, 2005, Jean Ablott took out a loan from Wells Fargo Bank secured by her property at 111 East Palmdale Avenue in Orange. On May 27, 2010, a fraudulent trustee's deed upon sale was recorded by which Cal-Western Reconveyance Corporation as trustee purported to convey title to the property to Pinnacle Group Realty Fund, one of the many entities controlled by appellant and his coconspirators.[7] On July 16, 2010, appellant paid $88,722.97 to Wells Fargo to pay off the remaining balance on the 2003 loan

---

    [7] After Ms. Ablott's death, the property sat vacant, and Wells Fargo remained the trustee under the 2003 deed of trust. On February 25, 2010, a notice of trustee's sale was recorded by Cal-Western Reconveyance Corporation as the "duly appointed trustee," but no documentation showing the substitution of Cal-Western Reconveyance Corporation for Wells Fargo as the trustee was presented to the trial court. Further, "J. Vantilborg," who signed the trustee's deed upon sale as the "Limited Signing Officer" of Cal-Western Reconveyance Corporation never worked for Cal-Western and had no authority to sign the document on Cal-Western's behalf.

and took control of the property. Two of appellant's coconspirators moved into the property and lived there rent-free for 17 months until appellant sold the house for $289,277.03.

The superior court awarded the Estate of Jean Ablott restitution in the amount of $208,777.03, plus interest. The award represented $200,777.03 in stolen equity as a result of the fraudulent trustee's deed upon sale and lost rental value at the rate of $500 per month for 17 months.

> *b. The restitution award of $231,636.91 to the Estate of Lyle Gilmor Skarsten based on counts 1 (conspiracy to commit grand theft of personal property) and 96 (grand theft of personal property) with respect to the property located at 2613 East Quincy Avenue in Orange*

Lyle Gilmor Skarsten owned the property at 2613 East Quincy Avenue free of any encumbrances when he died intestate on October 13, 2006. His daughter, Robin Skarsten, was having difficulty gaining control of the property and agreed to have appellant upgrade, probate, and sell the property. Appellant forged a grant deed recorded on November 10, 2011, purportedly signed by the deceased Mr. Skarsten, conveying title to the property to Ms. Skarsten. On December 6, 2011, another grant deed was recorded whereby Ms. Skarsten transferred the property to appellant. Thereafter, appellant sold the property for $321,771.67, of which he paid $79,000 to Ms. Skarsten and spent $11,134.76 on repairs.

The $231,636.91 restitution award, plus interest, to the Skarsten Estate included the net proceeds appellant received from the sale of the property ($321,771.67 offset by payments of $79,000 to Ms. Skarsten and $11,134.76 for repairs to the property).

## 2. Analysis

Appellant contends the trial court abused its discretion in awarding victim restitution to the Estates because the transactions in which appellant acquired the Estates' properties were "entirely legitimate." The trial court rejected the same argument below with the observation in its memorandum of decision that appellant had pleaded guilty to count 1, conspiracy to commit grand theft of personal property, count 83, procuring and offering a false or forged trustee's deed upon sale in connection with the Ablott Estate property, and count 96, grand theft of personal property in connection with the Skarsten Estate property. In light of appellant's admission of guilt with respect to these counts, any question as to whether the transactions were "legitimate" was not before the court in fixing the restitution awards.

Appellant also attacks the restitution award to the Skarsten Estate on the additional ground that the Estate was not a "victim" of appellant's criminal conduct because, he claims, the estate ("to the extent one even existed") "had no ownership interest in [the property] at any relevant time." Not only is this claim contrary to the evidence, but it is also belied by appellant's admission through his plea to count 96 (in which the Skarsten Estate was the named victim) that the Estate was a victim of his criminal conduct.

Appellant further contends that the People failed to "demonstrate an adequate factual basis to make a prima facie case for restitution" to the Estates because there was no evidence any documents were forged, or, in the case of the Skarsten Estate property, that "the sale was anything other than wholly lawful." But appellant's challenge to the *fact* that the trial court awarded

14

restitution to the Estates rather than contesting the *amounts* of these awards is fatal to his claim that the superior court abused its discretion. Appellant's guilty plea to counts 1, 83, and 96 established the right of any victims of these offenses to receive restitution from appellant. (§ 1202.4, subds. (a)(1) & (f); *Giordano, supra,* 42 Cal.4th at p. 656; *Stanley, supra,* 54 Cal.4th at p. 737.) The purpose of the restitution hearing was to afford appellant the opportunity to challenge the amount of restitution sought by the People, not to contest the validity of the conviction. Accordingly, it was the prosecution's initial burden to establish the *amount* of the victims' economic losses, after which the burden shifted to appellant to prove by a preponderance of the evidence that those losses were other than the amounts the People claimed. (*Selivanov, supra,* 5 Cal.App.5th at p. 788; see § 1202.4, subd. (f)(1) ["defendant has the right to a hearing before a judge to dispute the determination of the amount of restitution"].)

In short, appellant's attempt to challenge the restitution awards to the Estates by challenging the factual basis for the charges amounts to nothing more than an attempt to relitigate culpability. Appellant may not do so in this appeal from the restitution orders following his guilty plea. (*In re Troy Z.* (1992) 3 Cal.4th 1170, 1181 ["a defendant 'cannot admit the sufficiency of the evidence by pleading guilty [or nolo contendere] and then question the evidence by an appeal' "]; *People v. Zuniga* (2014) 225 Cal.App.4th 1178, 1187 [by pleading guilty a defendant admits all matters essential to the conviction]; see *People v. Cisneros-Ramirez* (2018) 29 Cal.App.5th 393, 399–400.) The trial court properly refused to entertain these contentions, as do we.

Appellant also challenges restitution to the Estates on the ground that "no representative or beneficiary of [the Estates] has ever made a claim for the theft of [the properties]." However, as set forth above, the prosecution has authority to seek restitution on a victim's behalf under section 1202.4, subdivision (f). (*Selivanov, supra*, 5 Cal.App.5th at pp. 784–785; see *Bernal, supra*, 101 Cal.App.4th at p. 162.) The fact that no representative or beneficiary of the Estates submitted a claim for restitution is therefore immaterial.

Finally, appellant contends that because his criminal conviction on count 96 (relating to the Skarsten Estate property on Quincy Avenue) was for grand theft of *personal*, not *real* property, and the prosecution did not obtain a *Harvey* waiver (*People v. Harvey* (1979) 25 Cal.3d 754, 758 (*Harvey*)), neither Ms. Skarsten[8] nor the Skarsten Estate was entitled to any restitution. The claim lacks merit. The "personal property" appellant admitted to stealing in entering his guilty plea to count 96 consisted of the proceeds from the sale of the Quincy Avenue property, minus the offset for the repairs and payment to Ms. Skarsten.

The trial court employed a rational method for determining the appropriate amount of restitution owed to the Estates. There was no abuse of discretion. (*Nichols, supra*, 8 Cal.App.5th at p. 342.)

---

[8] The trial court did not award restitution to Ms. Skarsten.

**C. *The superior court properly awarded restitution to the Lending Institutions and Guillermo Cilia based on the economic losses they sustained as a direct result of the criminal offenses to which appellant pleaded guilty, including the conspiracy to commit theft of personal property***

**1. The challenged restitution awards to the Lending Institutions and Guillermo Cilia**

> *a. The $48,248.45 restitution award to Fannie Mae based on counts 1 (conspiracy to commit grand theft of personal property) and 3 (grand theft of personal property) with respect to the property located at 2564 Deauville Street in San Diego*

In 2010 Gabriel and Claudia Eribez were in default on their 2007 mortgage and sought appellant's help to arrange a short sale of the property. Unbeknownst to Mr. Eribez, appellant had him sign a grant deed conveying the property as a gift to an entity controlled by appellant. But the handwritten notation "$0 Gift" was added to the deed after Mr. Eribez had signed it: He had not intended the conveyance as a gift to anyone. The grant deed was recorded on July 13, 2010. Thereafter, Mr. Eribez rented the property back from one of appellant's companies for $1,400 a month, believing he would have the opportunity to repurchase the property.

On October 19, 2010, Mr. Eribez purportedly filed a lawsuit in Orange County Superior Court for fraud and other causes of action as to the Deauville property against a title company and two mortgage lenders. Mr. Eribez, however, did not file or authorize the lawsuit. Soon thereafter, a lis pendens was recorded on the Deauville property at the San Diego County

17

Recorder's Office by "Wolfe Legal Services," and another lis pendens was filed in the Orange County Superior Court by a fictitious attorney. The Eribezes did not file or authorize the filing of either of these documents. Eventually, the lender, Fannie Mae, foreclosed, and a trustee's deed upon sale was recorded on November 10, 2011.

The $48,248.45 restitution award to Fannie Mae included $25,848.45 in foreclosure costs and $22,400 for lost rental value, calculated at $1,400 per month during the 16-month period Fannie Mae was unable to secure the property for its use.

> b. *The $34,535 restitution award to Bank of America based on counts 1 (conspiracy to commit grand theft of personal property) and 54 (grand theft of personal property) with respect to the property located at 501 South Courtney Avenue in Fullerton*

Karla Cruz and Octavio Morales paid appellant $1,000 to arrange a loan modification for their property at 501 South Courtney Avenue. During the loan modification process, they were told they needed to sign a grant deed, which they did. They never got the loan modification. Instead, beginning in November 2008, the couple was required to pay $695 per month in rent to appellant if they wished to remain in their home. They paid a total of $9,035 in rent for 13 months. Eventually, appellant purchased the property through one of his entities in a short sale from Bank of America. Upon the short sale, Bank of America paid an entity controlled by appellant a $9,000 commission and $16,500 to discharge a false lien placed on the property by appellant.

The superior court awarded restitution to Bank of America in the sum of $34,535, plus interest. The award included $9,035

18

for 13 months of lost rent, $16,500 paid on the false lien, and $9,000 paid as commission on the short sale.

> *c. The $66,300 restitution award to Bank of America based on counts 1 (conspiracy to commit grand theft of personal property) and 65 (grand theft of personal property) with respect to the property located at 1508 Wavertree Lane in Fullerton*

Francisca Guerrero sought defendants' assistance to arrange a short sale of her home. Appellant forged Ms. Guerrero's signature on a grant deed recorded July 3, 2009, conveying the property for no consideration to "George Penn," a name defendants made up for a nonexistent person. Ms. Guerrero moved out after being threatened by defendants, and the property was then rented out for $1,400 per month. Bank of America, the lender on the property, foreclosed on the property on January 15, 2013, but appellant recorded a lis pendens in order to delay foreclosure.

The $66,300 restitution award, plus interest, to Bank of America included $7,500 in legal costs to reclaim the property and $58,800 rental value for the 42 months appellants were in wrongful possession and Bank of America was unable obtain value from the property.

> *d. The $112,117 restitution award to Guillermo Cilia based on counts 1 (conspiracy to commit grand theft of personal property) and 105 (grand theft of personal property) with respect to the property located at 15668 Fairgrove Avenue in La Puente*

In 2008 Guillermo Cilia and his wife, Veronica Castro, were going through a divorce, and Mr. Cilia wanted to sell the house. Although he was not in default on the mortgage, Mr. Cilia

19

approached appellant to arrange a short sale of the property. Appellant told Mr. Cilia a short sale had occurred, but instead forged Mr. Cilia's signature on a grant deed gifting himself the property. Appellant then paid off Mr. Cilia's $175,393 loan on the property. The forged deed was recorded on March 23, 2009, and on September 22, 2010, appellant sold the property for $275,000, pocketing the proceeds.

Ms. Castro and her family were still living in the home when appellant assumed control of it. Appellant demanded that Ms. Castro pay $695 per month in rent to remain on the property. Ms. Castro, however, refused to pay rent because she had not signed the grant deed and she was still making payments on the mortgage. Appellant filed an unlawful detainer and evicted Ms. Castro from the home.

The superior court ordered restitution of $112,117, plus interest, to Mr. Cilia, consisting of $99,607 from the proceeds of the sale less repayment of the loan and $12,510 in lost rent for the 18 months appellant had wrongful possession of the property.

> *e. The $44,584.16 restitution award to Fannie Mae based on counts 1 (conspiracy to commit grand theft of personal property) and 16 (grand theft of real property) with respect to the property located at 10154 Camino Ruiz, No. 7 in San Diego*

James Conway approached appellant to arrange a short sale of his property at 10154 Camino Ruiz, No. 7, although he was not in default on his mortgage at the time. Believing he was authorizing a short sale, Mr. Conway signed a grant deed conveying the property as a "bonafide gift" to an entity controlled by appellant. After recording the deed on February 10, 2010, appellant rented the property out for $1,395 per month; after six

20

months the property was rented to a different tenant for $995 per month. On August 22, 2011, appellant filed a fraudulent lawsuit in connection with the property on behalf of "Jason Conway." On the same day a notice of pendency of action was recorded by a fictitious attorney whose listed phone number was for a device in appellant's office. Fannie Mae eventually foreclosed on the property on March 19, 2012, 25 months from the date of the fraudulent conveyance and after the dismissal of the sham lawsuit.

The superior court awarded restitution totaling $44,584.16, plus interest, to Fannie Mae. The award consisted of $27,275 for lost rent and $17,309.16 in legal costs.

> *f. The $54,250 restitution award to JP Morgan Chase based on counts 1 (conspiracy to commit grand theft of personal property) and 33 (grand theft of real property) with respect to the property located at 4597 Acoma Way in San Diego*

Thomas and Joni Dunn believed they were entering into a short sale of their property. Unbeknownst to the Dunns, the alleged short sale was to appellant, and the grant deed they signed was later modified to convey the property as a gift. The grant deed was recorded on February 25, 2010. Thereafter, appellant rented the property out at the rate of $1,750 per month until the tenants were evicted. Appellant and his coconspirators then stalled the eventual foreclosure of the property by posing as the Dunns and submitting false requests for short sale consideration and loan modifications to the lender, JPMorgan Chase, in order to coerce the lender into selling the property at a price below the property's actual valuation. On October 2, 2012,

31 months after appellant assumed control of the property, JPMorgan Chase foreclosed.

The superior court awarded JPMorgan Chase $54,250 in restitution, plus interest, for the 31 months of lost rental value.

> *g. The $16,250 restitution award to GMAC Mortgage based on count 40 (grand theft of real property) with respect to the property located at 1025 Osage Drive in Spring Valley*

On January 25, 2010, Francisco Plazola signed a grant deed conveying his property to Reconveyance Trustee LLC in the belief that he was entering into a short sale of the property. Mr. Plazola did not know that the company was controlled by appellant, and unbeknownst to Mr. Plazola, the words "this is a bonafide gift" were later added to the signed deed. The deed was then recorded on August 20, 2010. On March 23, 2010, appellant began collecting rent on the property at the rate of $1,250 per month. The lender, GMAC Mortgage, foreclosed on March 10, 2011.

The superior court awarded GMAC Mortgage restitution in the amount of $16,250, plus interest, representing the 13 months of lost rental value at the rate of $1,250 per month.

> *h. The $99,472.50 restitution award to Bank of America based on counts 1 (conspiracy to commit grand theft of personal property) and 44 (grand theft of real property) with respect to the property located at 30633 San Anselmo Drive in Murrieta*

In 2010 Mr. Plazola also sought appellant's assistance to obtain a loan modification with respect to another property he owned, but appellant persuaded him to short sell the property instead. On January 25, 2010, believing they were entering into

a short sale of the San Anselmo Drive property, Mr. Plazola and his wife signed a grant deed conveying the property to Reconveyance Trustee LLC. The Plazolas did not know that the company was controlled by appellant, and the language "this is a bonafide gift and the grantor received nothing in return" was added to the deed after the Plazolas signed it. The deed was then recorded on January 29, 2010. After taking control of the property, appellant rented it out for $1,750 per month. Eventually, on September 11, 2014, Bank of America foreclosed and gained control of the property, despite appellant's attempt to prevent the lender from foreclosing by submitting a fraudulent short sale offer to buy the property.

The superior court's $99,472.50 restitution award, plus interest, to Bank of America included $98,000 for 56 months of lost rental value and $1,472.50 in legal costs.

> *i. The $43,750 restitution award to GMAC Mortgage based on count 28 (procuring and offering a false or forged instrument) with respect to the property located at 4205 Lamont Street, No. 17 in San Diego*

Believing she was authorizing a short sale of her property, Kathleen Vestevich signed a grant deed conveying the property to Reconveyance Trustee LLC, a company controlled by appellant. Although the grant deed indicates the conveyance was a "bonafide gift," Ms. Vestevich did not intend to gift the property, and those words were not on the grant deed when she signed it. The grant deed was recorded on February 11, 2010. After gaining control of the property, appellant rented it out for $1,750 per month. In an effort to delay foreclosure, defendants filed a fraudulent complaint and lis pendens in September 2010.

23

Twenty-five months after appellant took possession, GMAC Mortgage, the lender, foreclosed on the property.

The superior court awarded GMAC Mortgage $43,750 in restitution, plus interest, for 25 months of lost rental value.

> *j. The $67,496 restitution award to Bank of America based on count 75 (procuring and offering a false or forged instrument) with respect to the property located at 210 South Montague Avenue in Fullerton*

Lindsay Ott sought appellant's assistance with a short sale of her home. Appellant falsely told Ms. Ott a short sale had occurred and had her sign a grant deed conveying the property to one of defendants' fictitious entities. After Ms. Ott signed the deed, the language "no consideration/gift transfer" was added; Ms. Ott did not intend to convey the property as a gift, and no short sale ever occurred. Appellant rented the property out for $1,400 per month. Bank of America foreclosed on September 24, 2012, 44 months after appellant obtained the property.

The court's $67,496 restitution award, plus interest, to Bank of America included $61,600 for 44 months of lost rental value and $5,896 for legal costs.

> *k. The $36,050 restitution award to IndyMac/One West Bank based on counts 1 (conspiracy to commit grand theft of personal property) and 50 (mortgage fraud) with respect to the property located at 13636 Hollowbrook Way in Corona*

On April 23, 2010, IndyMac/One West Bank, the lender on the Hollowbrook property, accepted a short sale for $324,654.83, of which the bank would receive $301,185.83. But the short sale was fraudulent: The purported buyer was a fictitious person made up by appellant, and no short sale for $324,654.83 occurred.

24

Rather, the property was sold for $365,000 to an actual buyer on April 26, 2010. Although IndyMac/One West Bank received the agreed payout of $301,185.83, appellant was paid $24,950 for a false lien placed on the property, a $9,125 commission was paid to appellant's realty company, and appellant's escrow company received $1,975 in escrow fees.

The superior court awarded IndyMac/One West Bank restitution in the amount of $36,050, plus interest, consisting of $24,950 paid to appellant on the false lien, the $9,125 commission paid to appellant's realty company, and $1,975 paid to appellant's escrow company. The court reasoned that although the difference between the fraudulent short sale and the actual short sale was greater than the restitution award, $36,050 represented the wrongful gains by appellant as a result of the fraudulent transaction.

> *l. The $62,546.42 restitution award to Wells Fargo Bank based on counts 1 (conspiracy to commit grand theft of personal property) and 88 (mortgage fraud) with respect to the property located at 1250 Venice Avenue in Placentia*

Douglas and Patricia Shrier owned the property at 1250 Venice Avenue. In late 2009, Mrs. Shrier was suffering from dementia and the couple had taken some losses in the stock market, which prompted Mr. Shrier to seek appellant's help in getting a loan modification. But appellant falsely told Mr. Shrier the loan modification request had been denied and persuaded him to do a short sale instead. On August 17, 2011, the lender on the property, Wells Fargo Bank, obtained a residential broker opinion that the property was valued at $465,000. But defendants submitted fraudulent documents to the bank

25

purporting to show that the best offers on the property were well below market value, and on December 23, 2011, the bank accepted a fraudulent short sale to appellant for $405,000.

The superior court awarded Wells Fargo Bank restitution in the amount of $62,546.42, plus interest. The award represented the lender's legal costs plus the difference between the appraised market value of the property, $465,000, and $405,000, the amount for which it was sold in the fraudulent short sale.

> *m. The $54,250 restitution award to Bank of America based on counts 1 (conspiracy to commit grand theft of personal property) and 15 (forgery) with respect to the property located at 656 Ballard Street, No. 10 in El Cajon*

Sergio Pulido approached appellant seeking a short sale of his home. Believing he was authorizing a short sale, Mr. Pulido signed a grant deed conveying the property to Reconveyance Trustee LLC, one of the companies appellant controlled. Although the grant deed indicates the conveyance was a "bonafide gift and the grantor received nothing in return," Mr. Pulido had no intention of giving his property away, and those words were not on the grant deed when he signed it. The grant deed was recorded on December 14, 2009. Mr. Pulido's ex-wife, Claudia Hatfield, continued to live at the property, paying rent to appellant at the rate of $875 per month. Appellant successfully delayed foreclosure by submitting fictitious below-market offers on the property. On February 18, 2015, 62 months after appellant wrongfully obtained the property, Bank of America, the lender, foreclosed.

The superior court awarded Bank of America $54,250 in restitution, plus interest, consisting of lost rental value at the rate of $875 per month for 62 months.

### 2. Analysis

#### a. *The challenged restitution awards are supported by substantial evidence.*

Running through appellant's challenge to all of the restitution awards is the general assertion that the awards are not supported by substantial evidence. Specifically, appellant contends that no competent evidence was presented to support the prosecution's restitution claims based on lost rent. Asserting that economic losses may not be established by the hearsay testimony of a nonvictim without documentary evidence to support the alleged losses, appellant claims that Donahue's lay testimony, which he avers was unsupported by any written claim for or documentary evidence of the purported economic losses, should have been excluded or was entitled to no weight because it was not " 'factually credible.' "

Of course, in reviewing the sufficiency of the evidence for a trial court's restitution order, " 'the " 'power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the trial court's findings." ' " (*Walker v. Appellate Division of Superior Court* (2017) 14 Cal.App.5th 651, 656.) We neither reweigh nor reinterpret the evidence, but rather determine whether there is sufficient evidence to support the inference the trier of fact has drawn. (*People v. Baker* (2005) 126 Cal.App.4th 463, 469.)

The prosecution carried its burden by presenting uncontroverted evidence of the economic losses sustained by the

victims of appellant's admitted criminal conduct through the testimony of the investigator on the case, Special Agent Donahue, and the investigative auditor. Donahue's testimony was supported by extensive documentation of the instruments of defendants' predatory real estate fraud scheme, including forged and fraudulent grant deeds, sham short sales, and fake lawsuits, lis pendens and other documents that were recorded to frustrate foreclosure on the properties and prolong the scheme. The prosecution also presented canceled checks from the rental of the misappropriated properties, not only to prove appellant's ill-gotten gains, but also to establish a rational measure of economic damage for the lost use of these properties.

The fact that some of this evidence was hearsay did not render it inadmissible or incompetent. As set forth above, a trial court has expansive discretion as to the type of information and calculation methods that may be used in determining restitution. (*Phu, supra,* 179 Cal.App.4th at p. 283; see *People v. Prosser* (2007) 157 Cal.App.4th 682, 691–692.) And section 1203.1d, subdivision (d) expressly prohibits exclusion of documentary evidence on hearsay grounds in determining restitution.

Appellant further contends that Donahue "testified repeatedly about the existence and contents of rent checks and receipts in the People's possession" but not introduced into evidence at the restitution hearing. He claims that this testimony was inadmissible and should have been excluded under Evidence Code sections 1521 and 1523. According to appellant, in the absence of these documents that were critical to proving economic losses, the exclusion of Donahue's testimony about them would have left the prosecution's restitution claims unsupported by substantial evidence. But the testimony which

appellant asserts was inadmissible occurred over just two pages of transcript, and referred only in general terms to the thousands of canceled checks from 20 to 30 bank accounts that represented payments to defendants. Donahue's brief testimony lacked any detail about the checks or the specific properties to which they related, and was offered simply to explain—as a general matter—that tracing only the checks to determine the value of lost use of the properties caused by appellant's fraudulent possession would be "difficult," and in some cases impossible. In fact, because tenants often paid cash, and because the properties were not necessarily rented out for the entire duration of appellant's wrongful possession, the sum of the checks themselves was not an accurate measure of the victims' actual economic losses. Donahue's testimony in this regard was properly admitted and accepted by the trial court.

Finally, appellant asserts in a series of footnotes that substantial evidence did not support the restitution awards to the Lending Institutions because the People's evidence—in the form of canceled checks and receipts—showed defendants received substantially lower amounts of rent than the court awarded in restitution. But appellant offers no basis for limiting the calculation of economic loss to the illicit gains defendants actually extracted from the properties they misappropriated. Indeed, appellant's formula would reward a defendant's incompetence in failing to obtain full value from the stolen property, rather than making the victim whole. Constraining restitution in this manner would thus run afoul of the statutory mandate that the restitution award *fully reimburse the victim for all economic losses sustained as a result of the defendant's criminal conduct*. (§ 1202.4, subd. (f)(3); *Stanley, supra,* 54 Cal.4th at p. 737;

29

*Giordano, supra*, 42 Cal.4th at p. 656.)  The canceled checks and receipts introduced by the People constituted substantial evidence of the rental value of the properties, but they did not tell the whole story of the victims' economic losses for which they were entitled to be reimbursed.

> *b. The Lending Institutions and Mr. Cilia were victims of appellant's criminal conduct, and the prosecution properly sought restitution on their behalf.*

Appellant challenges the restitution awards on the grounds that the lenders and Mr. Cilia suffered no economic losses from the offenses to which appellant pleaded guilty because they were not identified as victims in the indictment and they did not submit claims for restitution.  As set forth above, however, under section 1202.4, subdivision (f), the People were authorized to make a restitution claim and establish economic losses on behalf of any person or entity that suffered harm as a direct result of appellant's criminal conduct.  (*Selivanov, supra*, 5 Cal.App.5th at pp. 784–785.)  The victims on whose behalf the People sought restitution need not have been named in the indictment (*People v. Martinez* (2017) 10 Cal.App.5th 686, 724–725 [upholding restitution to unnamed victim of conspiracy]; *Walker, supra*, 231 Cal.App.4th at p. 1276), nor is there any requirement that the People present a written statement by victims detailing their economic losses (*Selivanov*, at pp. 784–785).

Here, because the Lending Institutions and Mr. Cilia suffered economic losses through the deprivation of the value and use of their properties as a direct result of appellant's admitted criminal conduct, they were clearly "victims" as defined by statute, even though they were not named in the counts to which appellant pleaded guilty.

30

*c. Lost rental value was a rational and appropriate measure of economic loss for the period in which appellant was in wrongful possession of the properties.*

Appellant contends that the People improperly sought, and the court abused its discretion in awarding, restitution on the basis of theories of liability and measures of economic loss unrelated to the charges in the indictment. Specifically, he alleges that the prosecution impermissibly changed the "theory of mortgage fraud from the theory alleged in the indictment, and added mortgage fraud claims not pleaded in the indictment." According to appellant, "[t]his post-plea, post-Wolfe's death addition of new claims with their new theory of and measure of economic losses for mortgage fraud is a clear Sixth Amendment violation." Appellant goes on to assert—without legal support—that lost rents do not constitute a valid measure of economic loss for mortgage fraud. And because all the restitution awards to the Lending Institutions were based on a theory of mortgage fraud, the types and amounts of economic losses the prosecution asserted (specifically, lost rental value) bore no relation to any actual economic losses sustained.

Contrary to appellant's contentions, the only theory of loss on which the People proceeded was that any victim who sustained economic losses as a direct result of appellant's criminal conduct with respect to each property and count of conviction was entitled to reimbursement.[9] (§ 1202.4, subd. (f);

---

[9] In support of his claim that the prosecution "impermissibly changed" its theory of restitution, appellant cites section 1009, which generally prohibits the amendment of a charging document following a guilty plea. Appellant's argument

31

*Stanley*, *supra*, 54 Cal.4th at p. 737; *Giordano*, *supra*, 42 Cal.4th at p. 656.) The prosecution's pursuit of this theory of restitution, based on article I, section 28, subdivision (b) of the California Constitution and section 1202.4 of the Penal Code, did not implicate, much less violate appellant's Sixth Amendment rights. (See *People v. Foalima* (2015) 239 Cal.App.4th 1376, 1398–1399 [no Sixth Amendment right to jury trial on restitution issues]; *People v. Pangan* (2013) 213 Cal.App.4th 574, 585 ["direct victim restitution is a substitute for a civil remedy so that victims of crime do not need to file separate civil suits. It is not increased 'punishment' "].)

In seeking restitution on behalf of a victim, it is the People's burden to present to the trial court a rational basis for calculating the victim's economic loss that is supported by the evidence. (*Selivanov*, *supra*, 5 Cal.App.5th at p. 788; *Taylor*, *supra*, 197 Cal.App.4th at p. 761.) The trial court may then fix restitution using the prosecution's formula as long as it is rational and reasonably calculated to make the victim whole. (*Giordano*, *supra*, 42 Cal.4th at pp. 663–664; *Nichols*, *supra*, 8 Cal.App.5th at p. 342.) However, "the amount ordered as restitution need not mirror what a victim might obtain in a civil action," nor does a trial court abuse its discretion in awarding restitution that does not reflect the exact amount of the loss. (*Bernal*, *supra*, 101 Cal.App.4th at p. 162; *People v. Akins* (2005) 128 Cal.App.4th 1376, 1382.)

---

in this regard is nonsense. Section 1009 has no application here: The prosecution's theory of restitution—that the victims of the crimes of which appellant was convicted were entitled to restitution—did not (and could not) "amend" the indictment or in any way "change" the offenses to which appellant pleaded guilty.

The prosecution met its burden here by adducing competent evidence that while appellant was in wrongful possession of the properties, the lenders were unable to obtain value from those properties.  A rational measure of that lost value was the monthly rent appellant charged (or reasonably could have obtained) while he controlled the properties.  Once the prosecution made this prima facie showing of loss, the burden shifted to appellant to show the loss was other than the prosecution claimed, and it was up to the trial court to determine which party had met its respective burden.  (*Kelly*, *supra*, 59 Cal.App.5th at pp. 1183–1184; *People v. Sy* (2014) 223 Cal.App.4th 44, 63.)  In light of appellant's failure to offer any evidence challenging the amounts of restitution sought by the People on behalf of the Lending Institutions and Mr. Cilia, the trial court did not abuse its discretion in awarding restitution to the victims in those amounts.  (*Keichler*, *supra*, 129 Cal.App.4th at p. 1048.)

> ### d. The superior court properly awarded restitution based on economic losses suffered as a direct result of the crimes to which appellant pleaded guilty.

Appellant contends that the People's failure to obtain *Harvey* waivers as to the 96 counts dismissed following appellant's plea agreement precluded restitution to victims whose economic losses were the result of criminal conduct alleged in the counts that were dismissed.  But as set forth above, the economic losses were shown to be a direct result of the crimes charged in the counts to which appellant pleaded guilty.  Thus, the absence of a *Harvey* waiver was irrelevant.

In *Harvey*, *supra*, 25 Cal.3d at page 758, the California Supreme Court held that a sentencing court may not consider

any facts underlying a dismissed count for the purpose of aggravating or enhancing the defendant's sentence. The court explained that, implicit in a plea bargain in which the defendant pleads guilty to one count in consideration for dismissal of another "is the understanding (*in the absence of any contrary agreement*) that defendant will suffer no adverse sentencing consequences by reason of the facts underlying, and solely pertaining to, the dismissed count." (*Ibid.*, italics added; *K.R. v. Superior Court* (2017) 3 Cal.5th 295, 304.) That "contrary agreement" became known as a *Harvey* waiver, which was codified to apply to victim restitution with the enactment of section 1192.3, subdivision (b): "If restitution is imposed which is attributable to a count dismissed pursuant to a plea bargain, as described in this section, the court shall obtain a waiver pursuant to *People v. Harvey* (1979) 25 Cal.3d 754 from the defendant as to the dismissed count."

Appellant's guilty plea included the conspiracy to commit grand theft of personal property charged in count 1, making appellant liable for restitution to *all* direct victims of the criminal conspiracy where his criminal conduct led to those victims' economic losses. (*People v. Martinez*, *supra*, 10 Cal.App.5th at pp. 724–725.) Only three properties were not part of the conspiracy: 1025 Osage Drive in Spring Valley (count 40, grand theft of real property), 4205 Lamont Street, No. 17 in San Diego (count 28, procuring and offering a false or forged instrument—lis pendens), and 210 South Montague Avenue in Fullerton (count 75, procuring and offering a false or forged instrument—lis pendens). But the prosecution's evidence established that GMAC Mortgage (counts 40 and 28) and Bank of America (count 75) suffered economic losses as a direct result of the admitted

34

criminal conduct underlying appellant's guilty pleas to counts 40, 28, and 75.  Because the restitution awards were based on losses attributable to the counts to which appellant pleaded guilty, no *Harvey* waiver was required.

> *e. Appellant may be entitled to a credit for restitution*
> *payments made by any of the codefendants only after*
> *such contributions are actually made.*

Appellant contends that the superior court abused its discretion in failing to offset the restitution orders against appellant by $245,834.60 in restitution paid by the codefendants. In a criminal case with multiple defendants, the trial court has the authority to require codefendants to pay restitution jointly and severally.  (*Nichols*, *supra*, 8 Cal.App.5th at p. 347.)  When the court makes such an order, each defendant is entitled to a credit for any actual payments made by the other.  (*People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1535.)  The Attorney General has no objection to any offset for restitution made by any codefendant, and the trial court also recognized that such an offset would be appropriate.  However, no payments appear to have been made by any of the codefendants; until they are, appellant's claim is premature.  (*Eye Dog Foundation v. State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 541 [the duty of every court " ' "is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it" ' "]; *People v. Pipkin* (2018) 27 Cal.App.5th 1146, 1149.)

## II. The Superior Court Properly Awarded Interest on the Stipulated Amount of Unpaid Taxes Owed to the Franchise Tax Board

Appellant contends that "[p]er [his] plea agreement, his restitution to [the Franchise Tax Board] was fixed at $140,754, an amount that necessarily included accrued interest and penalties up to either June 26, 2015, the date his plea was entered, or July 17, 2017, the date judgment was entered against him." The record contradicts appellant's claim.

As part of his plea agreement, appellant stipulated to restitution in the amount of $140,754 in unpaid taxes to the Franchise Tax Board. The sum did not include interest.[10] At the conclusion of the restitution hearing, the superior court ordered appellant's estate to pay restitution in the stipulated amount to the Franchise Tax Board, "plus applicable interest." The court elected to impose interest from the date of loss rather than the date of sentencing, in accordance with section 1202.4, subdivision (f)(3)(G).[11]

---

[10] Several exhibits submitted by the prosecution at the restitution hearing refute appellant's claim: People's exhibit 96, setting forth the calculation of appellant's unpaid taxes, showed taxes due in the amounts of $63,843 for 2009, $57,106 for 2010, and $19,805 for 2011, for a total of $140,754 without interest; People's exhibit 97a detailed the prosecution's calculation of interest separate and apart from the amount of unpaid taxes; and People's exhibit 98 listed the $140,754 in unpaid taxes with an additional $26,665.06 owed in accrued interest.

[11] Section 1202.4, subdivision (f)(3) provides in relevant part: "To the extent possible, the restitution order . . . shall be of a dollar amount that is sufficient to fully reimburse the victim or

Thus, contrary to appellant's assertion, the record plainly shows the stipulated amount of restitution owed to the Franchise Tax Board did *not* include interest. The superior court properly exercised its discretion in awarding interest from the date of loss, and the inclusion of interest did not give the Franchise Tax Board an impermissible windfall, as appellant claims.

Finally, appellant argues that interest should be capped as of June 26, 2015, when he entered his plea, or at the latest, July 21, 2017, the date of sentencing. Appellant asserts that the estate "should not [be] responsible for interest accruing on [the] award from the date the People were entitled to pay off [the Franchise Tax Board] . . . yet with no justification have not done so." But the prosecution was not authorized to recover the stipulated restitution on behalf of the Franchise Tax Board until the superior court accepted the stipulation. (See *People v. McCurdy* (2014) 59 Cal.4th 1063, 1100 [trial court was not required to accept stipulation offered by defendant]; *People v. Rogers* (2013) 57 Cal.4th 296, 329–330.) The court's acceptance of the stipulation did not occur until the court issued its memorandum of decision following the restitution hearing, which the parties agreed would not take place until *after* the case was resolved against all defendants.

Moreover, after the sentencing hearing and even since the superior court issued the memorandum of decision, appellant has been responsible for the ongoing accrual of interest on the

victims for every determined economic loss incurred as the result of the defendant's criminal conduct, including, but not limited to, all of the following: [¶] . . . [¶] (G) Interest, at the rate of 10 percent per annum, that accrues as of the date of sentencing or loss, as determined by the court."

37

restitution.  First, appellant delayed the restitution hearing at which the superior court accepted the stipulation by filing an appeal following his guilty plea.  That delay was followed by the delay caused by the special administrator's challenge to the restitution order in the instant appeal.  Accordingly, until this appeal is concluded and the judgment is final, the People will be foreclosed from recovering the stipulated restitution on behalf of the Franchise Tax Board, and interest on that award will continue to accrue.

## DISPOSITION

The superior court's March 9, 2020 restitution order is affirmed.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:



CHAVEZ, J.



HOFFSTADT, J.